**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1229-19

T.S., K.H., and E.J.T.,
guardian ad litem for H.S.,
a minor,

      Plaintiffs-Appellants,

v.

NEW JERSEY STATE POLICE,
NEW JERSEY STATE TROOPER,
CHRISTOPHER J. WRIGHT,
NEW JERSEY STATE TROOPER,
DAN CONNOLLY, LAW
ENFORCEMENT MEMBERS OF
THE MIDDLESEX COUNTY
PROSECUTOR'S OFFICE, LAW
ENFORCEMENT MEMBERS OF
THE SOMERSET COUNTY
PROSECUTOR'S OFFICE, LAW
ENFORCEMENT MEMBERS OF
THE MERCER COUNTY
PROSECUTOR'S OFFICE, LAW
ENFORCEMENT MEMBERS OF
THE FRANKLIN TOWNSHIP
POLICE DEPARTMENT, LT. J.
HOLLAR #5280, DETECTIVE I G.
SEFICK #5974, DETECTIVE D.
MURAGLIA #6996, DETECTIVE I

T. KELSHAW #6231, DSFC P. CIANO, #5133, DETECTIVE J. ASPROMONTI (MERCER COUNTY PROSECUTOR'S OFFICE), SGT. FRANCIS (MERCER COUNTY PROSECUTOR'S OFFICER), TROOPER PETERSON #6278, (NJSP TROOP "B" TACTICAL PATROL UNIT), and DSFC D E STRASSHEIM, DET. DOUGLAS SPRAGUE, (SAYREVILLE POLICE DEPARTMENT), OFFICER RICHARD BELOTTI, (SAYREVILLE POLICE DEPARTMENT), OFFICER MARK KURTZ, (MIDDLESEX COUNTY SHERIFF'S DEPARTMENT), OFFICER JOSEPH MORRIALE, (MIDDLESEX COUNTY SHERIFF'S DEPARTMENT), OFFICER FRANK SAUTNER, (MIDDLESEX COUNTY SHERIFF'S DEPARTMENT), DET. ROBERT MAZALEWSKI, (OLD BRIDGE POLICE DEPARTMENT), LT. RAY BASON, (MIDDLESEX COUNTY DEPARTMENT OF CORRECTIONS), and OFFICER KEVIN KOSA, (MIDDLESEX COUNTY DEPARTMENT OF CORRECTIONS),

       Defendants-Respondents,

and

LAW ENFORCEMENT MEMBERS OF THE PISCATAWAY TOWNSHIP POLICE DEPARTMENT, DETECTIVE SMITH (PISCATAWAY POLICE DEPARTMENT), and DETECTIVE ORANCHAK (PISCATAWAY

2

POLICE DEPARTMENT),

 Defendants.

_____

   Argued December 2, 2021 – Decided July 20, 2022

   Before Judges Alvarez, Haas and Mitterhoff.

   On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-3037-15.

   Kevin T. Flood argued the cause for appellants T.S., K.H., and E.J.T. (Law Office of Kevin T. Flood, LLC, attorneys; Lon C. Taylor, of counsel and on the briefs; Kevin T. Flood, on the briefs).

   Adam Robert Gibbons, Deputy Attorney General, argued the cause for respondents New Jersey State Police, SFC Christopher J. Wright, DSG Dan Connolly, Lt. James Hollar, DSG Glenn Sefick, Det. Douglas Muraglia, DSG Tom Kelshaw, DSFC Peter J. Ciano, Sgt Eric Peterson & DSFC D.E. Strassheim (Andrew J. Bruck, Acting Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Adam Robert Gibbons, on the brief).

   Michael R. Sarno, Deputy Attorney General, argued the cause for respondents Douglas Sprague, Richard Belotti, Mark Kurtz, Joseph Morriale, Frank Sautner, Robert Mazalewski, Ray Bason, Kevin Kosa and James Francis, (Andrew J. Bruck, Acting Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Michael R. Sarno, on the brief).

   Matthew P. Madden argued the cause for respondent Detective J. Aspromonti, Mercer County Prosecutor's

Office (Madden & Madden, PA, attorneys; Matthew P. Madden, on the brief).

PER CURIAM

In this civil rights and tort action arising from the violation of a knock-and-announce provision of a search warrant, plaintiffs T.S.,[1] K.H., and E.J.T., guardian ad litem for H.S., appeal an October 9, 2019 order granting summary judgment and dismissing plaintiffs' complaint with prejudice. After a careful review of the record and applicable law, we reverse and remand for trial.

We discern the following facts from the record. Plaintiffs were living with their parents, E.H.,[2] and S.S. in Piscataway, New Jersey. Their father became a target in an Attorney General Task Force investigation of a drug distribution ring during a thirteen-month wiretap initiative. On April 22, 2013, defendant Christopher Wright, a New Jersey State Trooper, submitted search and arrest warrant applications with an attached affidavit, citing the following violations:

> Leader of Narcotics Trafficking Network, in violation of N.J.S.A. 2C:35-3, Maintaining/Operating a Narcotics Production Facility, in violation of N.J.S.A. 2C:35-4, Possession with Intent to Distribute a Controlled Dangerous Substance, in violation of N.J.S.A. 2C:35-5, Distribution of a Controlled

---

[1] We use initials in caption and attorney selection to protect the identity of the children.

[2] We use fictious initials so as not to confuse this party with one of the plaintiffs.

A-1229-19

> Dangerous Substance, in violation of N.J.S.A. 2C:35-5, Money Laundering, in violation of N.J.S.A. 2C:21-25, Endangering the Welfare of Children, in violation of N.J.S.A. 2C:24-4 and Conspiracy to commit the aforementioned crimes, in violation of N.J.S.A. 2C:5-2
>
> . . . .

A judge granted the warrant requests, enabling the police to search plaintiffs' home "after first knocking and announcing, and identifying [themselves], and there[in] diligently search[ing] the entire premises for evidence related to the specified crimes." Arrest warrants were obtained for both parents.

On April 23, 2013, the task force deployed the Special Operations and Response Team (SORT) to execute the warrant. SORT did not review the warrant ahead of time but did review strategy at an initial briefing. The briefing was the second of two arranged by Wright. It is unclear whether Wright attended the second briefing; however, it is undisputed he never met with SORT. A report written on April 26, 2013, by the Middlesex County Prosecutor's Office SORT liaison, stated the meeting was to discuss the warrant's execution of a no-knock warrant on the property.

SORT failed to knock and announce their presence, instead executing a no-knock warrant. Plaintiffs' uncle, who slept on a pull-out couch in the living room adjacent to SORT's point-of-entry, awoke to the sound of the officers

5

breaking down the door. He was handcuffed and kept in the living room. In his deposition he explained there was no knock, and as he is a light sleeper, he would have awoken at the sound of a knock.

Plaintiff T.S., a then nineteen-year-old boy, was sleeping at the time of the entry. The police entered his room on the second floor and pointed their weapons at his head. They zip tied his hands and brought him to the living room.

Plaintiff K.H., a then seventeen-year-old boy, was also just waking up. Like T.S., the police entered K.H.'s room on the second floor, pointed their guns at his head, zip tied his hands, and brought him to the living room.

H.S. was eleven years old at the time of the event. Upon entering her room, one officer pointed a gun at the child's face. The officers brought her to the living room, but her hands were not zip tied.

Plaintiffs' parents were also brought to the living room and subsequently arrested pursuant to the arrest warrant. Both T.S. and K.H. complained that the zip ties were too tight, causing pain. Defendant Detective Sefick acknowledged hearing their complaints of pain. K.H.'s entreaties to loosen the zip ties were

A-1229-19

ignored.  Both boys[3] remained cuffed in the living room for two hours while the search was conducted.

SORT found twenty-nine bricks of heroin under E.H.'s, bed and packaging bags on the garage couch, including one containing heroin.  A report indicated SORT found $445 and five "glassine clear bags located in [a] wooden box on [the] floor of . . . [T.S.'s] room."  It also indicated SORT found one "bag containing [seven] clear glassine bags located in the upstairs closet in . . . [K.H.'s] bedroom."  The boys denied these items were in their rooms.  In fact, E.H., took responsibility for ownership of the drugs.  The chain of custody was unverifiable, as the author of the report did not collect the evidence personally and could not remember who did.

T.S. and K.H. were charged in relation to the incident, in papers signed by Wright.  They were not charged in relation to the baggies allegedly located in their rooms; rather, they were charged with possession of the controlled dangerous substance (CDS) found under E.H.'s bed.  T.S. was incarcerated for eighteen days, while K.H. was incarcerated for eleven days.  Eventually, the charges were voluntarily dismissed by the Attorney General's Office because no

---

[3]  We use the term "boys" to refer to T.S. and K.H. for the sole purpose of distinguishing them from their sister, H.S., who is also a plaintiff in this case.

evidence ever implicated plaintiffs in the drug distribution ring, despite a lengthy investigation during which approximately 20,000 phone calls were monitored.

Because SORT knocked down the front door, T.S. and K.H. came back to a burglarized home. Both described valuable items stolen from their home while they were incarcerated.

On May 20, 2015, plaintiffs filed a complaint alleging various civil rights and tort claims, naming the investigators involved because they did not know the names of the officers who executed the warrant. Defendants Wright and Dan Connolly, a New Jersey State Trooper, were the lead investigators. Defendant J. Aspromonti, a detective with the Mercer County Prosecutor's Office, was assigned to the wire-tap investigation and was present at the time of the warrant's execution.

The police failed to write an official report until November 20, 2015, two-and-a-half years after the raid. This report, authored by Sefick, indicated a no-knock warrant was executed. The police failed to turn over the report as part of their discovery obligations until January 14, 2016. Additionally, the report did not provide the names of all officers who executed the warrant. It listed defendants Oranchak and Smith, both detectives with the Piscataway Police

8

Department, as officers on the team, however, these officers certified they were executing another warrant at a different property during the raid in question. Plaintiffs eventually obtained the names of some of the officers in an email forwarded on February 21, 2018. From the report and subsequent discovery, plaintiffs were able to identify the following officers as involved in the warrant's execution:

> Lt. J. Hollar #5280, Detective I G. Sefick #5974, Detective D. Muraglia #6996, Detective I T. Kelshaw #6231, DSFC P. Ciano #5133, Detective J. Aspromonti (Mercer County Prosecutor's Office), Sgt. Francis (Mercer County Prosecutor's Office), Detective Smith (Piscataway Police Department), Detective [O]ranchak (Piscataway Police Department), Trooper Peterson #6278 (NJSP Troop "B" Tactical Patrol Unit), and DSFC D E Strassheim.
>
> . . . .
>
> . . . Det. Douglas Sprague, Sayreville Police Department, Officer Richard Belotti, Sayreville Police Department, Officer Mark Kurtz, Middlesex County Sheriff's Department, Officer Joseph Morriale, Middlesex County Sheriff's Department, Officer Frank Sautner, Middlesex County Sheriff's Department, Det. Robert Mazalewski, Old Bridge Police Department, Lt. Ray Bason, Middlesex County Department of Corrections.

A-1229-19

On January 2, 2019, plaintiffs filed a fourth amended complaint to name the officers involved. On May 9, 2019 and May 10, 2019, defendants filed motions for summary judgment.

On August 1, 2019, plaintiffs filed a notice of cross-motion against DAG Adam Gibbons and DAG Robert Preuss, to strike their answer and all pleadings, for sanctions and attorney fees, and to relieve plaintiffs from the discovery consent order because of defendants' continued willful non-compliance with discovery requests. On August 2, 2019, the judge denied plaintiffs' motion, stating, "[w]hile no opposition was filed, in the interests of judicial economy, expediency, and in relation to the other pending motions, this motion was ruled upon on the record."

On September 13, 2019, the judge held oral argument on the summary judgment motions. On October 9, 2019, the judge granted summary judgment and dismissed all of plaintiffs' claims in an order and written decision. This appeal followed.

On appeal, plaintiffs raise the following arguments for our consideration:

POINT I

THE TRIAL COURT CONSISTENTLY ERRED IN IGNORING AND/OR MINIMIZING PLAINTIFFS' HARMS AND THEIR RIGHT TO BOTH COMPENSATORY AND NOMINAL DAMAGES

AFFORDED THEM UNDER NJCRA/§1983. WHILE THE TRIAL COURT AGREED THAT PLAINTIFFS MADE A COLORABLE CLAIM THAT THE "KNOCK[-]AND[-]ANNOUNCE" SW WAS IMPROPERLY EXECUTED AS A "NO-KNOCK" SW, THE TRIAL COURT ERRED BY DISMISSING [K.H.] AND [H.S.'S] CONSTITUTIONAL CLAIMS . . . FOR SORT DEFENDANTS' VIOLATING THE "KNOCK[-]AND[-]ANNOUNCE" PROVISION OF THE WARRANT IN VIOLATION OF THE FOURTH AMENDMENT AS TO A) UNREASONABLE SEARCH (EXECUTION PHASE); B) UNREASONABLE AND EXCESSIVE FORCE (EXECUTION PHASE); AND C) EXCESSIVE FORCE[ (]SORT POINTING FIREARMS TO THE HEAD AND FACES OF PLAINTIFFS[)].

A. The Trial Court Erred By Dismissing [K.H.] And [H.S.'s] Unreasonable Search (Execution Phase) Claim By Declaring SORT's Violation Of The "Knock[-]And[-]Announce" SW Caused No Harm Attributable To The Wrongful Execution Of The Warrant; And In Doing So, The Trial Court Ignored The Purpose Of The "Knock[-]And[-]Announce" Requirement, That Plaintiffs Had A Reasonable Expectation Of Privacy To Their Home, And That [K.H.] And [H.S.] Were Entitled To Compensatory And Nominal Damages Under NJCRA.

B. The Trial Court Erred By Dismissing Plaintiff[s] [K.H.] And [H.S.'s] Unreasonable And Excessive Force (Execution Phase) Claim By Ruling The Initial Decision To 'Employ' SORT Was Reasonable, When Plaintiffs' Cause Of

11

Action Did Not Raise This Claim, But Rather The Subsequent Actions Of SORT Storming [The Property] In Violation Of The "Knock[-]And[-]Announce" SW Order Was Unreasonable And Excessive, And Claimants Were Thereby Entitled To Compensatory And Nominal Damages Under NJCRA/§1983.

C. The Trial Court Erred By Dismissing Plaintiff[s'] . . . Unreasonable And Excessive Force Claim- SORT Pointing Firearms To The Heads And Faces Of [T.S.] And H.S.- By Declaring SORTS' Actions Were Not Excessive Or Unreasonable But Rather Appropriate.

POINT II

THE TRIAL COURT ERRED IN DISMISSING [K.H.'S] EXCESSIVE FORCE CLAIM FOR INJURIES SUSTAINED TO HIS WRISTS FROM THE ZIP[-]TIES/HANDCUFFS BY SOLELY BASING ITS DECISION ON THE INJURY TO [HIM] AND DETERMINING IT WAS DE MINIMIS, RATHER THAN CONSIDERING THE TOTALITY OF THE CIRCUMSTANCES WHICH SHOWED THE FORCE WAS NOT OBJECTIVELY REASONABLE.

POINT III

THE TRIAL COURT IMPROPERLY DISMISSED PLAINTIFF [K.H.'S] FALSE ARREST CLAIM BY IMPROPERLY DETERMINING THERE WAS PROBABLE CAUSE FOR THE ARREST EVEN THOUGH DISPUTED FACTS EXISTED AS TO PROBABLE CAUSE, AND THEREFORE FAILED TO SUBMIT THE DISPUTED FACTS TO A JURY

12

FOR THEIR DETERMINATION AS TO WHETHER PROBABLE CAUSE DID EXIST.

POINT IV

THE TRIAL COURT ERRED BY DISMISSING THE FALSE IMPRISONMENT CLAIM BY [K.H.'S], WITHOUT ANY FINDINGS OF FACT, CONCLUSIONS OF LAW, OR ANY MENTION WHATSOEVER OF THIS CLAIM IN ITS DECISION GRANTING SUMMARY JUDGMENT TO DEFENDANTS.

POINT V

THE TRIAL COURT ERRED BY DISMISSING THE MALICIOUS PROSECUTION CLAIMS [BROUGHT] BY [T.S.] AND [K.H.] UNDER THE TORT CLAIMS ACT (TCA) WHEN THE CLAIM WAS PLED UNDER THE NJCRA, AND FURTHER ERRED BY DISMISSING SAID CLAIM BY MAKING A FINDING OF PROBABLE CAUSE.

> A. Malicious Prosecution Claims Were Improperly Dismissed Under The TCA, When They Were Clearly And Properly Pled Under The NJCRA In The Third Count Of The Fourth Amended Complaint.

> B. Malicious Prosecution Claims By [T.S.] And [K.H.] Were Improperly Dismissed When The Trial Court Made A Finding As To Probable Cause When That Determination Should Have Been Submitted To A Jury; And Further, A Finding Of Probable Cause Does Not Necessarily Insulate A Malicious Prosecution Claim.

13

POINT VI

IN DISMISSING PLAINTIFFS' CIVIL CONSPIRACY CLAIMS, THE TRIAL COURT ERRED BY 1) APPLYING THE WRONG STANDARD OF REVIEW ON SUMMARY JUDGMENT; 2) DISREGARDED ALL LAW AND THE OVERWHELMING UNDISPUTED FACTS IN THE RECORD SUPPORTING PLAINTIFFS' CIVIL CONSPIRACY CLAIM.

A. Trial Court Applied The Wrong Standard Of Review.

B. In Dismissing Plaintiffs' Civil Conspiracy Claim, The Trial Court Erred By Disregarding The Law And The Overwhelming Undisputed Facts In The Record Supporting This Claim.

POINT VII

IN DISMISSING PLAINTIFFS' FAILURE TO INTERVENE CLAIM, THE TRIAL COURT ERRED BY LIMITING IT TO THE UNLAWFUL ENTRY AND NOT THE NJCRA CLAIMS RELATING TO EXCESSIVE FORCE, UNLAWFUL ARREST, FALSE IMPRISONMENT, AND MALICIOUS PROSECUTION.

POINT VIII

IN DISMISSING PLAINTIFFS' FAILURE TO SUPERVISE CLAIM, THE TRIAL COURT ERRED IN A) APPLYING THE WRONG LAW, B) LIMITING THE CLAIM TO THE VIOLATION OF THE "KNOCK[-]AND[-]ANNOUNCE" SW ORDER, AND

14

C) DISREGARDING COMPETENT EVIDENCE IN THE RECORD SUPPORTING SAID CLAIM.

POINT IX

THE TRIAL COURT ERRED BY DISMISSING PLAINTIFFS' CIVIL RIGHT CLAIMS WITHOUT ANY FINDINGS OF FACT OR CONCLUSIONS OF LAW AS TO DECLARATORY AND/OR INJUNCTIVE RELIEF (EQUITABLE RELIEF NOT BARRED BY QUALIFIED IMMUNITY).

POINT X

TRIAL COURT IMPROPERLY GRANTED QUALIFIED IMMUNITY BY SIMPLY STATING, "THEREFORE, AS PROBABLE CAUSE DID EXIST IN THIS CASE, QUALIFIED IMMUNITY IS APPLICABLE TO THE DEFENDANTS," RATHER THAN FIRST SUBMITTING THE FACTUALLY DISPUTED ISSUE OF PROBABLE CAUSE TO A JURY FOR ITS DETERMINATION IN ACCORDANCE WITH SCHNEIDER V. SIMONINI[4]; AND FURTHER FAILING TO MAKE ANY FINDINGS OF FACTS AND CONCLUSIONS OF LAW AS TO ALL CONSTITUTIONAL CLAIM[S], NOT JUST THE ONES IMPACTED BY THE PROBABLE CAUSE DETERMINATION.

POINT XI

THE TRIAL COURT ABUSED ITS DISCRETION IN DISMISSING[,] WITHIN ONE DAY OF ITS FILING, PLAINTIFFS' AUGUST 1, 2019 NOTICE OF CROSS MOTION AGAINST STATE DEFENDANTS AND THEIR ATTORNEYS, [DEPUTY ATTORNEY

---

4  163 N.J. 336 (2000).

GENERAL] ADAM GIBBONS AND ROBERT PREUSS, SEEKING SEVERAL FORMS OF RELIEF INCLUDING SANCTIONS AND ATTORNEY'S FEES FOR THE CONTINUED WILLFUL NONCOMPLIANCE WITH THEIR DISCOVERY OBLIGATIONS IN THIS MATTER WHICH INVOLVES MINORITY PLAINTIFFS CLAIMING THEIR CIVIL RIGHTS WERE VIOLATED BY LAW ENFORCEMENT.

We review a trial court's grant of summary judgment de novo, applying the same standard as the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)). If a rational jury could resolve disputed material facts in plaintiffs' favor, the motion must be denied. With this well-established standard in mind, we conclude genuine fact issues precluded summary judgment on each of plaintiffs' claims and it was therefore error to summarily dismiss the action. We address these claims in turn.

Unreasonable Search Claims

Plaintiffs first argue the motion judge erroneously concluded they did not have standing to bring a civil rights claim premised on the violation of the knock-and-announce provision of the search warrant. The judge held "[t]he only person that possibly may have a claim under these facts is the non-party uncle. He is the only one that can argue that he was exposed to 'severe fright and humiliation' that was the cause of this unannounced entry."

In determining whether a violation of the knock-and-announce rule is actionable, courts apply the following three-step test:

> (1) Congress intended the statute to "benefit the plaintiff"; (2) "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States."
>
> [Tumpson v. Farina, 218 N.J. 450, 475 (2014) (quoting Blessing v. Freestone, 520 U.S. 329, 340-41 (1997)).]

Civil damages under civils rights acts are the sole remedy for knock-and-announce violations. Hudson v. Michigan, 547 U.S. 586, 598 (2006). There are three rationales underlying officers' obligation to knock and announce their presence before entering:

> (i) "decreasing the potential for violence"; (ii) "protection of privacy"; and (iii) "preventing the

17

physical destruction of property." As to the first of these, it has been cogently noted that an "unannounced breaking and entering into a home could quite easily lead an individual to believe that his safety was in peril and cause him to take defensive measures which he otherwise would not have taken had he known that a warrant had been issued to search his home." As to the second, notice minimizes the chance of entry of the wrong premises by mistake and the consequent subjecting of innocent persons to "the shock, fright or embarrassment attendant upon an unannounced police intrusion." . . . The third purpose is equally valid, for quite obviously a person should ordinarily "be allowed the opportunity to voluntarily admit the officer into his home" instead of suffering damage to his property.

[State v. Rodriguez, 399 N.J. Super. 192, 199 (App. Div. 2008) (quoting State v. Johnson, 168 N.J. 608, 616 (2001)).]

Here, it is undisputed that SORT acted as if they had been issued a no-knock warrant. The search warrant they were executing, however, required them to first "knock and announce" their presence. Plaintiffs alleged that they were subjected to violence when the officers unexpectedly entered their rooms when they were sleeping and woke them while pointing a firearm at their heads. This surprise entry allegedly, and perhaps unsurprisingly, caused plaintiffs to suffer significant shock and fear. The destruction of the front door facilitated the theft of valuable items from the apartment and made it impossible for plaintiffs, two of whom were minors, to safely return to their home. Thus, SORT's conduct vis

18

a vis plaintiff arguably invoked all three rationales underpinning the officers' duty to knock and announce. We thus conclude the motion judge erred in dismissing these constitutional claims for lack of standing.

Excessive Force Claims

Plaintiffs next take issue with the judge's dismissal of plaintiffs' excessive force claims. In that regard, the judge found "the employment of the SWAT/SORT team was reasonable as the target residence was the subject of serious C.D.S. crimes and the target residence occupants were subject to arrest warrants." The judge found no issue with the SORT team temporarily pointing their weapons at plaintiffs during their initial sweep of the home. The judge also determined "[a]ny injury that was sustained by [p]laintiffs was de minimis" and did not amount to excessive force.

An excessive force claim turns on whether the officers' actions were objectively reasonable under the circumstances, regardless of intent. Velazquez v. City of Camden, 447 N.J. Super. 224, 241 (App. Div. 2016). Excessive force claims have been recognized in

> cases involved an officer drawing a weapon on an unarmed child. See, e.g., Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2002) (en banc) (finding excessive force where officer trained a firearm on an infant during a sweep of a gang member's house); Holland v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001)

(finding excessive force where officers "continu[ed] to hold the children directly at gunpoint after the officers had gained complete control of the situation"); McDonald v. Haskins, 966 F.2d 292, 294-95 (7th Cir. 1992) (finding excessive force where officer held a gun to the head of a nine-year-old child who was not suspected of any crime during a search of the child's family home).

[Stiegel v. Peters Twp., 600 Fed. Appx. 60, 65-66 (3d Cir. 2014) (alteration in original).]

In examining excess force, courts consider the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989). The key question in weapons-drawing excessive force claims is whether the officer reasonably perceived danger. Ibid.

The first Graham factor weighs in defendants' favor given the seriousness of the drug trafficking and related crimes giving rise to the search warrant. However, there is no allegation that anyone in the apartment, let alone plaintiffs, attempted to flee. In addition, whether plaintiffs posed an imminent threat to the officers' safety is far from clear. At the time of the raid, all three children were asleep. We conclude a jury should determine whether the officers' use of force with a firearm was objectively reasonable under the circumstances.

20

We also conclude that the judge erred in dismissing the excessive force claims based on his assessment that the boys' injuries from being zip tied were too de minimis to support a claim. Contrary to the judge's reasoning, "excessive force is not determined by injury alone." Graham-Smith v. Wilkes-Barre Police Dep't, 739 Fed. Appx. 727, 732 (3d Cir. 2018). Extreme pain due to excessively tight handcuffs is cognizable as excessive force, and "demonstrat[ing] . . . expression or signs of discomfort at the time [the plaintiff] was handcuffed" is evidence supporting the claim. Gilles v. Davis, 427 F.3d 197, 208 (3d Cir. 2005). To prove such an excessive force claim, plaintiffs need only "contend[] that [they] offered any reason for the defendants to believe that [they] had been in pain." Finnemen v. SEPTA, 267 F. Supp. 3d 639, 648 (3d Cir. 2017). Plaintiffs can prove this knowledge by showing they repeatedly asked for the cuffs to be loosened. Whiting v. Bonazza, 545 Fed. Appx. 126, 130 (3d Cir 2013).

Here, the boys continually complained that the zip ties were too tight. Sefick acknowledged hearing their complaints of pain during the two hours they remained restrained. K.H.'s pleas to loosen the cuffs went unanswered. The boys' subjective pain, evidenced by their unanswered requests to loosen the ties, is sufficient to raise a jury question on the use of force.

A-1229-19

## Civil Conspiracy Claims

Plaintiffs assert the motion judge erred in dismissing plaintiffs' civil conspiracy claims. The judge found "[t]here are no independent facts included in the [p]laintiffs' Fourth Amended Complaint to support this count . . . . even if this [c]ourt were to allow the count to survive this fatal handicap, [p]laintiffs have no facts based on competent evidentiary materials that create a genuine issue of material fact."

Liability for civil conspiracy accrues when the defendants reached an understanding to act, under color of state law, to deprive the plaintiff of a constitutional right. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293-94 (3d Cir. 2018). A cover up or "'conspiracy of silence' among officers is actionable as a . . . conspiracy because the coordinated officer conduct 'impede[s] an individual's access to courts' and renders 'hollow' a victim's right to redress in a court of law." Id. at 294 (alteration in original) (quoting Vasquez v. Hernandez, 60 F.3d 325, 328-29 (7th Cir. 1995)). This can include failure to disclose the identities of the officers who committed the offense. Ibid.

Plaintiffs must show a meeting of the minds to prove civil conspiracy. Cole v. Encapera, 758 Fed. Appx. 252, 257 (3d Cir. 2018). As the Jutrowski court explained:

[b]ecause "inferring mental state from circumstantial evidence is among the chief tasks of factfinders," Kedra v. Schroeter, 876 F.3d 424, 444 (3d Cir. 2017) (citing United States v. Wright, 665 F.3d 560, 569 (3d. Cir. 2012)), an allegation of conspiracy can only be overcome at summary judgment when "the moving parties' submissions foreclose[] the possibility of the existence of certain facts from which 'it would be open to a jury . . . to infer from the circumstances' that there had been a meeting of the minds," [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970))].

[Jutrowski, 904 F.3d at 295.]

Under this exacting standard, we conclude the judge should not have granted summary judgment on plaintiffs' civil conspiracy claim. The evidence of the years-long delay in issuing a report and the failure to identify the officers involved in the execution of the warrant until five years after the raid rationally (but not conclusively) supports an inference that there was a conspiracy to cover up deficiencies in the search and shield the involved officers. We find defendants failed to "foreclose[] the possibility of the existence of certain facts from which 'it would be open to a jury . . . to infer from the circumstances' that there had been a meeting of the minds." Ibid. (quoting Anderson, 477 U.S. at 249). Thus, the conspiracy claims should not have been dismissed.

23

Next, plaintiffs contend the judge erred in dismissing plaintiffs' failure to intervene claim. With respect to this decision, the judge held the officers were not liable for failure to intervene because "the speed in which the warrant was executed" deprived the officers of a reasonable opportunity to intervene.

"'[A] police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force,' but only 'if there is a realistic and reasonable opportunity to intervene.'" El v. City of Pittsburgh, 975 F.3d 327, 335 (3d Cir. 2020) (alteration in original) (quoting Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002)). Multiple-stage events generally give rise to a genuine issue of fact. Ibid. Where the violation is brief, however, there is not a reasonable opportunity to intervene. Ricks v. Shover, 891 F.3d 468, 479 (3d Cir. 2018). That defendant officers are "in the vicinity" is typically enough to overcome a motion for summary judgment because the "extent of each officer's participation is thus a classic factual dispute to be resolved by the fact finder." Smith, 293 F.3d at 650.

We conclude the judge was too narrowly focused on the moment of entry into the apartment and the timeframe while the apartment was being secured. He did not consider the series of events leading up to the raid. Evidence in the

24                                                                    A-1229-19

record shows that there were two briefings about the warrant's execution immediately preceding the raid. Sefick's belated report indicated the discussions centered on execution of a no-knock warrant. However, Wright, who obtained the warrant, arranged the briefings, and attended at least the first, never disabused anyone of their understanding of the operation.

Contrary to the judge's finding, this operation was not brief. Rather, it unfolded over multiple stages, from a complex investigation leading to search warrants at multiple locations, to mobilizing SORT, to conducting two briefings to discuss the warrant's execution, to the allegedly faulty execution in which: a no-knock entry was conducted in violation of the warrant; the chain of custody of evidence was not maintained for the two-hour-long search; and plaintiffs were arrested for possession of CDS after E.H., admitted their ownership. There were many defendants involved at each of these stages who had the ability and opportunity to intervene to avoid these deficiencies. Therefore, the claim should not have been dismissed.

Failure to Supervise Claims

Plaintiffs also contend the judge erred in dismissing their failure to supervise claims. The judge dismissed those claims for the same reason he dismissed the failure to intervene claims, reasoning the supervising officers did

25

not have time to act due to "the speed in which the warrant was executed." Again, the judge was narrowly focused on the moment of entry.

To hold a municipality liable for the constitutional violations of its employees or agents, a plaintiff can show that the municipality's failure to train or its policy caused an injury, and that the failure to train or policy arose from "deliberate indifference to constituents' constitutional rights." Wright v. City of Phila., 685 Fed. Appx. 142, 145 (3d Cir. 2017). "Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." Thomas v. Cumberland Cnty., 749 F.3d 217, 222 (3d Cir. 2014) (alteration in original) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989)). This is known as Monell liability. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

Deliberate indifference is a stringent bar, and policy makers must have "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." Connick v. Thompson, 563 U.S. 51, 61 (2011). "[I]n certain situations, the need for training 'can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights' even without

a pattern of constitutional violations." Thomas, 749 F.3d at 223 (quoting Canton, 489 U.S. at 390 n.10). One example is where "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," but the municipality does not train officers on the use of deadly force. Canton, 489 U.S. at 390 n.10.

Despite this stringent standard, we find it was error to grant summary judgment. Executing search warrants is one of SORT's core tasks, so a jury could decide that the officers' inability to distinguish between knock-and-announce and no-knock warrants constitutes failure to train in and of itself. Coupled with the other deficiencies in the execution of the warrant, there is sufficient evidence to withstand summary judgment as to a pattern and practice of inadequate training.

A-1229-19

In dismissing T.S.' and K.H.'s unlawful arrest claims[5] and malicious prosecution claims,[6] the judge relied on his finding of probable cause. In support of his finding of probable cause, the judge stated, "[s]uspected C.D.S. was found in a common area. In [p]laintiff's [K.H.'s] room, [seven] glassine bags that is commonly used in distribution of drugs was found. In [p]laintiff's [T.S.'] room, [five] clear glassine bags were found and also $445[] in cash."

"Common-law malicious prosecution requires showing, in part, that a defendant instigated a criminal proceeding with improper purpose and without probable cause." McDonough v. Smith, 139 S. Ct. 2149, 2156 (2019). Further, to show false arrest, a plaintiff must prove he was "arrested without legal authority[.]" Mesgleski v. Oraboni, 330 N.J. Super. 10, 24 (App. Div. 2000).

---

[5] For T.S.s' and K.H.'s unlawful arrest claims, the judge granted summary judgment for defendants Aspromonti, Smith, and Oranchak, finding that they were not involved at the time. The judge erred because there is evidence in the record placing all three of them at the scene. During Pizzuro's deposition he confirmed Smith and Oranchak were in the NJSP Assignment List as part of the warrant execution team for 189 Hillside but could not confirm whether they were present.

[6] For T.S.s' and K.H.'s malicious prosecution claims, the judge granted summary judgment for defendants Francis and SORT because they "played no role in instituting or initiating the criminal proceedings." The judge erred because there is evidence in the record placing them at the scene, including the official report released on November 20, 2015.

"A plaintiff need not prove the lack of probable cause, but the existence of probable cause will nevertheless defeat the action." Id. at 24-25. Thus, "probable cause is an absolute defense to an allegation of malicious prosecution or false arrest[.]" Tarus v. Borough of Pine Hill, 189 N.J. 497, 521 (2007).

Probable cause "is a well-grounded suspicion that a crime has been or is being committed." State v. Nishina, 175 N.J. 502, 515 (2003) (quoting State v. Sullivan, 169 N.J. 204, 211 (2001)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity[,]" and officers are not required to clear a high bar. District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Illinois v. Gates, 462 U.S. 213, 243-44 n.13 (1983)).

Probable cause is typically determined by a judge, however, disputes about the factual underpinning of the finding are to be decided by a jury. Schneider, 163 N.J. at 360. The Supreme Court has articulated a specific process for resolving such disputes as it relates to probable cause:

> when disputed historical facts are relevant to either probable cause or the existence of a reasonable, but mistaken, belief concerning its existence, the trial court must submit the disputed factual issue to the jury in the form of special interrogatories for resolution by the jury. After receipt of the jury's answers, the trial judge must then decide the legal issue of whether probable cause existed and, if not, whether a reasonable police

29

official could have believed in its existence. Regarding the reasonableness of the belief, in the absence of probable cause, the judge must decide whether the defendant has proven by a preponderance of the evidence that his or her actions were reasonable under the particular facts.

[Ibid.]

Here, a finding of probable cause was improper because there were disputes about the location and ownership of the drugs and paraphernalia. First, there is evidence in the record calling into question the accuracy of the evidence log, as the chain of custody is unverifiable. Additionally, E.H., took responsibility for ownership of the drugs and both boys deny possessing the items. Because no chain of custody was maintained and no one could identify who removed items, if any, from the boys' rooms, it appears doubtful the State can prove where the baggies were located. Indeed, lacking any competent evidence, it is unclear whether testimony about baggies being in the boys' rooms would be admissible based solely on a stale police report. They were not charged with possession of paraphernalia, but only with the possession of CDS as to which their father had already admitted ownership.

At a minimum, there is a genuine fact issue whether drug paraphernalia was in the boys' rooms which, if resolved in plaintiffs' favor, would defeat probable cause. The judge necessarily resolved the competing factual assertions

30

in defendants' favor to support his finding of probable cause. He then relied on the disputed finding of probable cause to grant defendants qualified immunity.[7] Even assuming the admissibility of the hearsay police report, there remain significant and genuine disputes of fact underpinning the judge's probable cause determination. Pending the jury's resolution of the critical facts, summary judgment on the malicious prosecution and the judges according the officers qualified immunity was premature and an error.

Plaintiffs' Cross-Motion

With respect to the denial of plaintiffs' cross-motion for sanctions based on discovery violations, we are hampered in our review due to the judge's failure to make appropriate factual findings and legal conclusions, as required by Rule 1:7-4(a). "Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion." Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990). Thus, we must reverse and remand on that issue to accord the judge an opportunity to provide his reasons for denying the motion.

---

[7] "The doctrine of qualified immunity operates to shield 'government officials performing discretionary functions generally . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Morillo v. Torres, 222 N.J. 104, 116 (2015) (alteration in original) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

A-1229-19

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1229-19